## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Joel W.,                                            Case No. 19-cv-3193 (ECT/ECW)

      Plaintiff,

    v.                                          **REPORT AND RECOMMENDATION**

Andrew M. Saul, Commissioner of Social
Security,

      Defendant.

This matter is before the Court on Plaintiff Joel W.'s ("Plaintiff") Motion for

Summary Judgment (Dkt. 12) and Defendant Commissioner of Social Security Andrew

Saul's ("Defendant") Motion for Summary Judgment (Dkt. 14). Plaintiff filed this case

seeking judicial review of a final decision by Defendant denying his claim for disability

insurance benefits. This case has been referred to the undersigned United States

Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local

Rule 72.1. For the reasons discussed below, the Court recommends that Plaintiff's

Motion be denied, and Defendant's Motion be granted.

## I.     BACKGROUND

Plaintiff filed previous applications for Title II disability insurance benefits and

Title XVI supplemental security income on August 19, 2014. (R. 74.) After those claims

were denied initially and upon reconsideration, Administrative Law Judge Jeffrey W.

Hart ("ALJ Hart") determined that Plaintiff was disabled from August 16, 2014 through

November 1, 2015 and awarded benefits. (R. 74, 83-84.) ALJ Hart determined that

Plaintiff had severe impairments of Vestibular System Disease (Meniere's disease[1]) and anxiety, and that the severity of Plaintiff's Meniere's disease medically equaled the criteria of section 2.07 of 20 C.F.R. part 404, subpart P ("listing 2.07"). (R. 78, 80.) In making both of those determinations, ALJ Hart gave weight to the testimony of an impartial medical expert, specifically the medical expert's testimony that Plaintiff's Meniere's disease medically equaled listing 2.07. (R. 74, 79, 81.)

Plaintiff filed the application for Title II disability insurance benefits at issue in this case on January 5, 2017, alleging disability beginning on November 11, 2016. (R. 11, 103.) He alleged disability due to Meniere's disease, left knee replacement, right knee ACL reconstruction, bone spur removal, gunshot wound to lower abdomen, gout, Effexor withdrawal, and low back fusion. (R. 91.) Plaintiff's claim was denied initially on May 26, 2017 (R. 101, 103) and on reconsideration on September 15, 2017 (R. 115-16, 117). Plaintiff sought and received a hearing before Administrative Law Judge Virginia Kuhn ("the ALJ") on March 4, 2019, where Plaintiff appeared and testified and was represented by counsel. (R. 45-69.) No medical expert testified at the hearing.

---

[1]     "Meniere's disease is 'an affection characterized clinically by vertigo, nausea, vomiting, tinnitus, and fluctuating and progressive sensory loss associated with endolmphatic hydrops.'" *Cox v. Allin Corp. Plan*, 70 F. Supp. 3d 1040, 1044 (N.D. Cal. 2014) (quoting *Stedman's Medical Dictionary* 561 (28th ed. 2006)).

The ALJ issued an unfavorable decision on April 30, 2019.  (R. 8-25.)  Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a),[2] the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity since November 11, 2016, with the exception of December 2017 through February 2018, when Plaintiff drove for Uber and Lyft.  (R. 13-14.)  At step two, the ALJ determined that Plaintiff had the following severe impairments: "osteoarthritis of the left knee, status post December 2016 total knee replacement; obesity; and vestibular Meniere's disease.  (R. 14.)

At step three, the ALJ determined that Plaintiff did not have an impairment that meets or medically equaled the severity of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 15-16.)  With respect to Meniere's disease and listing 2.07, the ALJ found as follows:

> The claimant's Meniere's disease does not meet or equal listing 2.07, disturbance of labyrinthine-vestibular function (including Meniere's disease), which requires history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing, with both (A) and (B): (A) disturbed

---

[2]    The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and (B) hearing loss established by audiometry. While the claimant does have Meniere's disease, the evidence does not establish progressive loss of hearing as required by the listing. Specifically, the claimant has had caloric testing and hearing testing throughout the relevant time period, with findings indicating the claimant's hearing is normal. (Exhibit B-12F, pp. 5, 12-17) There are some findings indicating "very slight loss" in the right ear, but "very close to normal hearing" and that his hearing is "within a normal range". (Exhibit B-12F, p. 6) Thus, the claimant's testing results do not provide a basis to conclude his condition meets the requirements of listing 2.07. Findings envisioned as equivalent to those required by the listing are not present to medi[c]ally equal the listing.

(R. 15.) The ALJ additionally considered listing 1.02 "for major dysfunction of a joint for consideration of the knee impairment" and "the musculoskeletal, respiratory and cardiovascular impairments under Listings l.00Q, 3.00I, and 4.00F, respectively" for consideration of Plaintiff's obesity. (R. 15-16.)

At step four, after considering the entire record, the ALJ found that Plaintiff had the following residual functional capacity ("RFC"):

[T]o perform light work as defined in 20 CFR 404.1567(b) except: no climbing of ladders, ropes or scaffolds; no work at unprotected heights or with hazards, and similarly no balancing as if one were at unprotected heights or needing to walk along a narrow plank; frequent use of foot controls, and frequent pushing and pulling with the left lower extremity; occasional climbing of ramps and stairs; occasional stooping, kneeling, crouching and crawling; as well as an environment that would be defined as set forth in the Selected Characteristics of Occupations as having a moderate noise level per the definition of moderate for noise in the Selected Characteristics of Occupations as well as no tasks that would result in vibrations to the body; and an indoor temperature-controlled environment.

(R. 16.) The ALJ found that Plaintiff was unable to perform any past relevant work. (R. 23.)

At the fifth step of the sequential analysis, the ALJ concluded that jobs existed in

significant numbers in the national economy that Plaintiff could perform given his age, education, work experience, and RFC.  (R. 24.)  Based on the testimony of a vocational expert, the ALJ concluded that Plaintiff "would be able to perform the requirements of representative occupations such as" cashier, mail clerk, and lab sample collector.  (R. 24.)  Accordingly, the ALJ deemed Plaintiff not disabled.  (R. 25.)

Plaintiff requested review of the decision.  (R. 191-92.)  The Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner.  (R. 1.)

On December 30, 2019, Plaintiff filed the present action.  (Dkt. 1.)[3]  Plaintiff then filed a Motion for Summary Judgment on May 18, 2020 (Dkt. 12), alleging that his impairments meet or equal listing 2.07 and requesting that the Court reverse the Commissioner's decision and award benefits or, in the alternative, remand with instruction that a medical expert to be scheduled to testify as to whether listing 2.07 is met or equaled (Dkt. 13 at 5, 12).[4]  Defendant filed his Motion for Summary Judgment on

---

[3]    Plaintiff asserts that he filed a new claim for disability benefits in December 2019 and that this claim was approved at the initial, state agency review stage in February 2020.  (Dkt. 13 at 2, 11.)  There is no evidence before the Court regarding the evidence or particulars of that determination, and the Court has not considered it with respect to any issue in this case.

[4]    Plaintiff's request for relief is limited to an award of benefits on the grounds that "the evidence clearly supports meeting Listing 2.07" or remand with an "instruction that a Medical Expert be scheduled to testify and offer an opinion as to whether Listing 2.07 is met or equaled."  (Dkt. 13 at 12.)

June 22, 2020.  (Dkt. 14.)[5]

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.  The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    RELEVANT RECORD

Plaintiff has a history of Meniere's disease beginning in 2014 and was previously awarded disability benefits on the basis of his Meniere's disease symptoms for a period beginning on August 16, 2014 and ending on November 1, 2015.  (R. 81-82 (previous disability determination); R. 292 (December 2, 2015 diagnosis of Vestibular Meniere's disease, right ear, by Michael Paparella, M.D.); *see also, e.g.*, R. 292, 297, 299, 302, 541, 546, 579, 584, 593 (treatment records documenting presence of Meniere's disease, ranging from December 2, 2015 to July 11, 2018).)  Plaintiff underwent right endolymphatic sac enhancement surgery for his intractable Meniere's disease on March 17, 2016, and his condition subsequently improved, and he returned to his previous job.  (R. 82 (previous disability determination); R. 463-64 (March 17, 2016 surgery records listing Dr. Paparella as surgeon); R. 296 (March 24, 2016 treatment notes by Dr. Paparella reporting March 17 right endolymphatic sac enhancement procedure and

---

[5]    Defendant appears to have filed his supporting memorandum twice, on June 22, 2020 (Dkt. 15) and June 23, 2020 (Dkt. 16).  The memoranda appear to be identical; the only difference is Docket Number 16 includes an attachment containing courtesy copies of two cited cases (Dkt. 16-2) and Docket Number 15 does not.  The Court cites to the first filed memorandum (Dkt. 15) in this Report and Recommendation.

Plaintiff "doing okay since then").)  On a disability report dated March 23, 2017, Plaintiff reported that he stopped working on November 11, 2016 "[b]ecause of [his] condition(s)."  (R. 215; *see also* R. 209.)  A Disability Report - Appeal form dated June 29, 2017 stated that Plaintiff said his Meniere's disease was getting worse as of April 2017 (R. 242), and a Disability Report - Appeal form dated August 4, 2017 stated the same as of August 2017 (R. 260).

For context, the Court reviews the evidence related to Plaintiff's hearing after the March 17, 2016 surgery and before Plaintiff's alleged onset date of November 11, 2016. On April 22, 2016, Dr. Paparella described Plaintiff's "chief complaint" as vertigo and hearing loss, and reported, "His hearing is basically at a normal level."  (R. 297.) Plaintiff's audiometry results on April 22, 2016 showed right ear air conduction thresholds between 15 decibels ("dB") and 40 dB and speech reception thresholds ("SRT") of 20 dB on the right ear and 15 dB on the left ear.  (R. 307.)  On July 15, 2016, Dr. Paparella again described Plaintiff's "chief complaint" as vertigo and hearing loss, and reported, "His hearing is holding up at a good normal level."  (R. 299.)  Plaintiff's audiometry results on July 15, 2016 showed right ear air conduction thresholds between 10 dB and 35 dB and SRTs of 15 dB on the right ear and 10 dB on the left.  (R. 306.)  Dr. Paparella again noted "hearing loss" as a chief complaint on September 21, 2016 but did not comment on Plaintiff's hearing otherwise.  (R. 301.)  He noted, "[Plaintiff] is doing quite nicely," and "Good result following sac enhancement on 3/17/16 for intractable Meniere's disease."  (R. 301.)  Plaintiff's audiometry results on September 21, 2016

showed right ear air conduction thresholds between 15 dB and 30 dB and SRTs of 20 dB on the right ear and 25 dB on the left.  (R. 305.)

On December 21, 2016, Dr. Paparella reported, "I am delighted that 9 months [after the sac enhancement surgery] he is getting along remarkably well with his Meniere's disease and lack of vertigo," and, "[h]is hearing is holding up at a normal level.  I am pleased to see he is getting along so well . . . ."  (R. 302.)  Plaintiff's audiometry results on December 21, 2016 showed right ear air conduction thresholds between 10 dB and 30 dB and SRTs of 20 dB on the right ear and 10 dB on the left.  (R. 304.)

On September 12, 2017, Dr. Paparella noted hearing loss in the Review of Systems, along with "ringing in the ears."  (R. 594.)

On September 29, 2017, Dr. Paparella noted Plaintiff's "chief complaint" as dizziness and hearing loss, and reported, "I am pleased to note that his hearing actually is holding up at a normal level.  There does appear to be a Type B tympanogram.  He is having some relapse which we will treat."  (R. 596.)  Plaintiff's audiometry results on September 29, 2017 showed right ear air conduction thresholds between 15 dB and 30 dB and SRTs of 15 dB on the right ear and 10 dB on the left.  (R. 608.)

On February 6, 2018, Dr. Paparella noted Plaintiff's "chief complaint" as vertigo, hearing loss, and pressure in the ears, and reported, "He is having some recurrent symptoms that could be related to barometric pressure changes, anxiety and other possibilities.  . . .  His audiogram shows a very slight loss in the right ear.  Very close to normal hearing.  His hearing still seems to be within normal range."  (R. 597.)  Plaintiff's

audiometry results on February 6, 2018 showed right ear air conduction thresholds between 15 dB and 35 dB and SRTs of 20 dB on the right ear and 10 dB on the left. (R. 607.)

On May 29, 2018, Dr. Paparella noted Plaintiff's "chief complaint" as vertigo, hearing loss, and Meniere's disease, and reported, "He was doing reasonably well up until about 2 months ago. . . . Fortunately, his hearing looks to be as good as it was previously. So his hearing is basically normal in the right ear." (R. 598.) Dr. Paparella noted a diagnosis of "Meniere's disease involving his right ear along with vertigo and hearing loss in the right ear." (R. 598.) Plaintiff's audiometry results on May 29, 2018 showed right ear air conduction thresholds between 10 dB and 30 dB and SRTs of 15 dB on the right ear and 10 dB on the left. (R. 606.)

Plaintiff's audiometry results on August 14, 2018 showed right ear air conduction thresholds between 10 dB and 35 dB and SRTs of 20 dB on the right ear and 15 dB on the left. (R. 605.) The test results noted, "Patient reports no change in hearing." (R. 605.)

On September 28, 2018, Dr. Paparella did not comment on Plaintiff's hearing in his Testing and Examination notes, though he discussed Plaintiff's Meniere's disease and other symptoms and noted, "He is having a great deal of trouble and did have a good result following his procedure back in March of 2016, more than 2 years ago." (R. 600-01.) Dr. Paparella noted hearing loss in the Review of Systems, along with ringing in ears. (R. 601.) Plaintiff's audiometry results on September 28, 2018 showed right ear air

conduction thresholds between 15 dB and 40 dB and SRTs of 25 dB on the right ear and 15 dB on the left.  (R. 604.)

On November 16, 2018, Dr. Paparella did not comment on Plaintiff's hearing in his Testing and Examination notes, though he discussed Plaintiff's Meniere's disease and other symptoms and noted, "[H]e is doing much better at the present time," and "Doing well under medical control."  (R. 602.)  The Review of Systems "ha[d] not changed since his visit on 9/28/18."  (R. 602.)  Plaintiff's audiometry results on November 16, 2018 showed right ear air conduction thresholds between 5 dB and 30 dB and SRTs of 15 dB on the right ear and 10 dB on the left.  (R. 603.)  The test results noted, "Patient reports no change in hearing."  (R. 603.)

At the hearing before the ALJ on March 4, 2019, regarding his hearing, Plaintiff testified as follows:

Q      You have any issues with hearing?

A      My hearing when it goes out, what happens is you'll get a sudden burst of pressure in one ear.  What's bad about that is when you have one ear pressurized and not the other, what happens that ear will pressurize and your hearing won't go out at the same time.  As the pressure fade out, the hearing will fade back in.

Q      You have hearing trouble as well?

A      You have instantaneous, sudden hearing loss that comes back.  That creates cumulative damage over time.

Q      How often are you having these hearing losses?

A      It used to be before I had surgery on my ear, it would happy [sic] several times per se [sic].  Not [sic] that happens 2-3 times a day.

Q      Any trouble interacting with people, talking on the phone?

A    It can be a real issue.  I used to talk on my right ear and now I talk on left.  Speaker phone because of the hissing sensitivity, that will irritate the Meuniere's [sic].

Q    Any other triggers?

A    There are a lot of triggers.  The big ones are sound, being exposed to noise.  There are other triggers, but I can't think of them all.

(R. 55-56.)

As to other references to Plaintiff's hearing in the record, records from orthopedic treatment on October 5, 2016 and January 23, 2017 noted "hearing loss" in symptoms and "hearing intact to the spoken word" in physical exam.  (R. 325, 327, 329, 332.) Records from colorectal treatment on February 2, 2018 noted "hearing loss" in symptoms.  (R. 553.)  A Function Report - Adult dated May 5, 2017 listed "hearing" as one of the items that Plaintiff's illnesses, injuries, or conditions affected.  (R. 238 (also noting noise sensitivity); *see also* R. 255 (Function Report – Adult dated August 4, 2017) (again listing "hearing" as item that Plaintiff's illnesses, injuries, or conditions affected).)

### III.  <u>LEGAL STANDARD</u>

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence in the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law.  *Nash v. Comm'r., Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions."  *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th

11

Cir. 2007)).  The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Id.* (quoting *Travis*, 477 F.3d at 1040).  "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even when it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome."  *Id.* (quoting *Travis*, 477 F.3d at 1040).  In reviewing the record for substantial evidence, the Court may not substitute its own judgments or findings of fact for that of the ALJ.  *See Hilkemeyer v. Barnhard*, 380 F.3d 441, 445 (8th Cir. 2004).

This case addresses step three of the sequential evaluation process.  At step three, "[t]he claimant has the burden of proving that his impairment meets or equals a listing."  *Carlson v. Astrue*, 604 F.3d 589, 593 (8th Cir. 2010) (citing *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004)).  "To meet a listing, an impairment must meet all of the listing's specified criteria."  *Id.* (quoting *Johnson*, 390 F.3d at 1070).  "Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing.  An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify."  *McCoy v. Astrue*, 648 F.3d 605, 611-12 (8th Cir. 2011) (cleaned up).  "During this step, the ALJ has the responsibility to decide whether 'medical equivalence' has been established."  *Carlson*, 604 F.3d at 592.  An impairment is "equivalent" to a listed impairment if there are medical findings "at least of equal medical significance to the required criteria."  20 C.F.R. § 404.91526(b)(1)(ii); *see also Carlson*, 604 F.3d at 592 (quoting 20 C.F.R. § 416.926(a)).  "If the ALJ finds that a claimant has an impairment

that meets or equals one of the listings, then the claimant will be found disabled."

*Carlson*, 604 F.3d at 592.

> Listing 2.07, the only listing at issue in this appeal, reads as follows:

> Disturbance of labyrinthine-vestibular function (including Meniere's disease), characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing.  With both A and B:

> A.     Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and

> B.     Hearing loss established by audiometry.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.07.

## IV.   **DISCUSSION**

Plaintiff asserts that he meets or equals listing 2.07.  (Dkt. 13 at 5.)  Specifically, he asserts that, first, the ALJ's conclusion that Plaintiff's condition did not meet that listing's requirement for hearing loss was error (*id.* at 8-10) and, second, the ALJ's failure to schedule and elicit testimony from a medical expert on whether listing 2.07 was met or equaled was error (*id.* at 11-12).  These arguments are discussed below.

### A.     **Listing 2.07 Hearing Loss Requirements**

Before turning to Plaintiff's "hearing loss" arguments, it is worth repeating the specific reason given by the ALJ as to why Plaintiff did not meet listing 2.07: "While the claimant does have Meniere's disease, the evidence does not establish **progressive loss of hearing** as required by the listing."  (R. 15 (emphasis added).)  This "progressive loss of hearing" language is found in the non-lettered paragraph of listing 2.07, while

paragraph B requires "[h]earing loss established by audiometry."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.07.

Plaintiff argues that "[d]espite the ALJ's insistence [Plaintiff] does not suffer from hearing loss and therefore does not meet 2.07, the record clearly and repeatedly documents hearing loss through audiometry testing."  (Dkt. 13 at 9.)  Plaintiff relies on audiograms from the relevant time period showing right ear air conduction thresholds between 20 and 40 dB at certain frequencies (R. 603 (November 16, 2018), R. 604 (September 28, 2018), R. 605 (August 14, 2018), R. 606 (May 29, 2018), R. 607 (February 6, 2018), R. 608 (September 29, 2017)).  (*Id.* at 8 (citing records).)  He contends that these audiograms show "mild" hearing loss and therefore satisfy paragraph B of listing 2.07.  (*Id.* at 8-9.)  In support of this argument, Plaintiff cites to sources stating that air conduction thresholds between 26-40 dB measured by audiometry are classified as "mild" hearing loss.  (*Id.* at 8 & n.3 (citing CDC, *National Health and Nutrition Examination Survey: Audiometry Procedures Manual* 1-11 (Jan. 2011), www.cdc.gov/nchs/data/nhanes/nhanes_11_12/ audiometry_procedures_manual.pdf), n.4 (citing *Degree of Hearing Loss*, Am. Speech-Language-Hearing Assoc., www.asha.org/public/hearing/degree-of-hearing-loss (last visited Jan. 20, 2021)).)  Defendant does not appear to take issue with this classification scheme, and describes Plaintiff's hearing loss as "mild."  (Dkt. 15 at 6.)

Although it is not perfectly clear, Plaintiff seems to be arguing that the "progressive hearing loss" requirement in the non-lettered paragraph of listing 2.07 is satisfied when paragraph B is met and that his audiograms, which showed "mild" hearing

loss at some frequencies, meet paragraph B of listing 2.07.  (Dkt. 13 at 9-10 (citing cases as discussing whether "progressive hearing loss" is a separate requirement from "hearing loss established by audiometry" and arguing "a plain language reading of Listing 2.07 requires only the presence of hearing loss").)  Plaintiff argues that listing 2.07 does not require a specific level of hearing loss or severe hearing loss and that the preamble to section 2.00 "only references 'fluctuating hearing loss.'"  (*Id.* at 10.)

Defendant responds that Plaintiff's arguments are based "on a skewed and untenable reading of listing 2.07" (Dkt. 15 at 1) and "substantial evidence supported the ALJ's step 3 finding that Plaintiff did not prove the type of hearing loss demanded by listing 2.07" (*id.* at 10).[6]  Defendant further argues that Plaintiff's reading "misunderstand[s]" and "circumvent[s]" the purpose of the listings (*id.* at 5) and that "[g]iven Dr. Paparella's description, the ALJ sufficiently supported his [sic] finding" (*id.* at 9).  Specifically, Defendant argues that "Plaintiff must prove all three parts of listing 2.07 to qualify, *see Stadterman v. Berryhill*, 2019 WL 1359473, at *4 (W.D. Penn. Mar. 26, 2019), including both a hearing loss and a progressive hearing loss."  (*Id.* at 6.)

---

[6]    Defendant also argues that "Plaintiff gives unwarranted importance to the ALJ's step 2 finding that his vestibular Meniere's disease was severe."  (Dkt. 15 at 4 (citing Dkt. 13 at 10).)  The Court does not understand Plaintiff to be arguing that a step two finding of a severe impairment dictates a finding of disability at step three, or as contending that at step two, ALJ should have found Plaintiff's hearing loss to be a severe impairment separate and apart from the step two finding regarding Meniere's disease.  Rather, he seems to be arguing that ALJ's and State Agency's incorporation of limitations on noise level supports his argument that he suffered from the hearing loss required by listing 2.07.  (*See* Dkt. 13 at 10.)

15

The Court declines to adopt Plaintiff's interpretation of listing 2.07, that is, that satisfying paragraph B by showing "hearing loss established by audiometry" necessarily satisfies the "progressive hearing loss" requirement in the non-lettered paragraph of listing 2.07. This is for several reasons. First, this interpretation would read the word "progressive" out of the listing. *See Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 823 (8th Cir. 2009) ("We also should 'avoid a regulatory construction that would render another part of the same regulation superfluous.'") (cleaned up) (quoting *United States v. Stanko*, 491 F.3d 408, 413 (8th Cir. 2007)). Second, the Social Security regulations state that the Social Security Administration "will find that your impairment(s) meets . . . a listing when it satisfies all of the criteria of that listing, **including any relevant criteria in the introduction**." 20 C.F.R. § 404.1525(c)(3) (emphasis added). Plaintiff's proposed construction of listing 2.07 is inconsistent with this regulatory directive. Third, the Social Security regulations state, "We will consider your test scores together with any other relevant information we have about your hearing, including information from outside of the test setting" when evaluating hearing loss. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.00 B(1)(a). This supports the conclusion that a finding as to "progressive hearing loss" may encompass more than audiometry results.

Fourth, Plaintiff's interpretation is not supported by caselaw. The Eighth Circuit has rejected a similar attempt to read out introductory language in connection with listing 12.04. *See Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006) ("According to the Commissioner, the introductory paragraph of the Listing requires that the deficits in adaptive functioning are initially manifested before age 22. According to Maresh, the

introductory paragraph is merely an introduction that sets no requirements.  Under

Maresh's interpretation, he need only meet part C's requirements . . . .  This court agrees

with the Commissioner that the requirements in the introductory paragraph are

mandatory.").  Further, several district court cases considering listing 2.07 found it

imposes a requirement for "progressive hearing loss" even when audiometry testing

revealed a mild loss of hearing.  *See, e.g.*, *Gendron v. Berryhill*, No. 3:17 CV 207 (JGM),

2018 WL 774903, at *6, *11-12 (D. Conn. Feb. 8, 2018) (affirming ALJ's finding "that

plaintiff's vertigo does not meet Listing 2.07 because 'a requirement necessary for that

listing is that the hearing loss be considered <u>progressive</u>'" even though "audiometry

showed 'mild bilateral high frequenc[y] sensorineural hearing loss'" and "mild

sensorineural hearing loss in both ears (high frequency) with borderline thresholds across

all frequencies") (cleaned up); *Simmons v. Colvin*, No. 2:13CV665, 2015 WL 845689, at

*1 & n.1 (E.D. Va. Feb. 24, 2015) (substantial evidence supported ALJ's conclusion that

plaintiff "**failed to establish a progressive loss of hearing**" even though ENT specialist

found plaintiff had "very mild bilateral" hearing loss, but he could hear conversational

voice, and plaintiff testified that his hearing was "fine") (emphasis added).  Further, in

*Stadterman*, the court described listing 2.07 as:

> Disturbance of labyrinthine-vestibular function (including Meniere's
> disease), which is "characterized by a history of frequent attacks of balance
> disturbance, tinnitus, and progressive loss of hearing," **plus both**:
>
> A. Disturbed function of vestibular labyrinth demonstrated by
>    caloric or other vestibular tests; and
>
> B. Hearing loss established by audiometry.

2019 WL 1359473, at *3 (emphasis added) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.07).[7]  Plaintiff has cited no case finding that satisfaction of paragraph B of listing 2.07 requires the conclusion that the required "progressive hearing loss" is present.  The Court will not adopt this interpretation.

The Court next considers whether substantial evidence supports the ALJ's conclusion that "the evidence does not establish **progressive loss of hearing** as required by the listing."  (R. 15.)  Plaintiff's primary point in this regard is that the audiograms established "mild" hearing loss.  (Dkt. 13 at 9.)  It is true that numerous audiograms included right ear air conduction thresholds in the "mild" hearing loss range (never more than 40 dB) at certain frequencies.  (R. 304, 603-08.)  But, Dr. Paparella described Plaintiff's hearing "holding up at a normal level" (R. 302) on the same day Plaintiff's audiogram measured right ear air conduction thresholds at 30 dB (R. 304 (December 21, 2016); as again "holding up at a normal level" (R. 596) on the same day Plaintiff's audiogram measured right ear air conduction thresholds at 30 dB (R. 608 (September 29, 2017)); as a "very slight loss in the right ear," "[v]ery close to normal hearing," and "seems to be within a normal range" (R. 597) on the same day Plaintiff's audiogram measured right ear air conduction thresholds at 30 dB and 35 dB (R. 607 (February 6,

---

[7]    The court in *Stadterman* remanded for further consideration as to listing 2.07 because the ALJ stated "the objective medical evidence does not document history of balance disturbance, tinnitus, or progressive hearing loss, or the severity of hearing loss and other requirements of those Listings" in connection with listing 2.07 but later "actually note[d] that Plaintiff's diagnosis of Meniere's disease 'was supported by the abnormal findings of vestibular testing and progressive hearing loss was supported by the audiologic findings.'"  2019 WL 1359473, at *3-4.  No such contradictory findings as to progressive hearing loss are present here.

2018)); and as "look[ing] to be as good as it was previously" and "basically normal in the right ear" (R. 598) on the same day his audiogram measured a right ear air conduction threshold at 30 dB (R. 606 (May 29, 2018)). Further, Plaintiff's right ear air conduction thresholds after the surgery and before the alleged onset date included measurements at 30 dB, 35 dB, and 40 dB (R. 307 (April 22, 2016), R. 306 (July 15, 2016), R. 305 (September 21, 2016)), but Dr. Paparella described Plaintiff's hearing as "at a good normal level" (R. 299 (July 15, 2016)) and stated Plaintiff was "doing quite nicely" (R. 301 (September 21, 2016)).

As previously noted, the Social Security Administration "will consider your test scores together with any other relevant information we have about your hearing, including information from outside of the test setting" when evaluating hearing loss. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.00 B(1)(a). Dr. Paparella treated Plaintiff's Meniere's disease for years, and the ALJ was permitted to credit his characterization of Plaintiff's hearing loss—which is "other relevant information" about Plaintiff's hearing—when determining whether Plaintiff had demonstrated "progressive hearing loss" and finding that Plaintiff's "testing results do not provide a basis to conclude his condition meets the requirements of listing 2.07."[8]  (*See* R. 15.)  Plaintiff also had a

---

[8]    The ALJ's language could suggest that she interpreted the audiograms as demonstrating "normal" hearing (that is, air conduction thresholds of 25 dB or below). (R. 15 ("Specifically, the claimant has had caloric testing and hearing testing throughout the relevant time period, with findings indicating the claimant's hearing is normal.") (citing R. 596, 603-08).)  But the Eighth Circuit has "consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case." *Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999).  Here, when read in context, it is apparent that the

"normal" ability to communicate.  (R. 601, 602.)  Further, as to the "progressive"

requirement, the evidence of record does not show Plaintiff's hearing loss worsening

beyond the 30 dB to 40 dB range that was measured before the alleged onset date.

(*Compare* R. 305-06, *with* R. 304, 603-08.)

In sum, while Plaintiff's audiograms showed some measurements that fell in the

"mild" hearing loss range, this does not require the conclusion that listing 2.07 is met.

*See, e.g.*, *Gendron*, 2018 WL 774903, at *6, *11-12 (affirming ALJ's finding "that

plaintiff's vertigo does not meet Listing 2.07 because 'a requirement necessary for that

listing is that the hearing loss be considered <u>progressive</u>'" even though "audiometry

showed 'mild bilateral high frequenc[y] sensorineural hearing loss'" and "'mild

sensorineural hearing loss in both ears (high frequency) with borderline thresholds across

all frequencies") (cleaned up); *Bristol v. Colvin*, No. 2:15-CV-21, 2016 WL 3166514, at

*8 (D. Vt. June 6, 2016) (substantial evidence supports conclusion that listing 2.07 not

met where audiologic evaluation measured "mild" hearing loss); *Simmons*, 2015 WL

845689, at *1 & n.1 (substantial evidence supported ALJ's conclusion that plaintiff

"**failed to establish a progressive loss of hearing**" even though an ENT specialist found

plaintiff had "very mild bilateral" hearing loss, but he could hear conversational voice,

and plaintiff testified that his hearing was "fine") (emphasis added); *Dombrowski v.

Astrue*, No. 11 C 2102, 2011 WL 5903503, at *12 (N.D. Ill. Nov. 22, 2011) ("By way of

---

ALJ was relying on Dr. Paparella's characterization of Plaintiff's hearing, which took
into account the audiograms as well as Plaintiff's ability to converse normally.  (R. 601
("Ability to communicate is normal."), R. 602 (same).)

example, Plaintiff claims that her September 17, 2001 and October 27, 2003 audiograms show that she had 'progressive hearing loss' as required by the Listing. In fact, the tests both show only 'slight' or 'mild' bilateral sensorineural hearing loss. In assessing an October 25, 2004 test that produced similar results, an audiologist remarked that Plaintiff's hearing was 'essentially stable.' Dr. Marzo agreed that Plaintiff's hearing remained relatively stable as of April 2006, and the ME testified that Plaintiff's hearing loss did not establish 'anything near' the Listing's requirements.") (citations omitted). In this case, substantial evidence—Dr. Paparella's repeated characterizations of Plaintiff's hearing as "normal" and assessment that Plaintiff's ability to communicate was "normal"—supports the ALJ's conclusion that Plaintiff's Meniere's disease did not meet the "progressive hearing loss" requirement of listing 2.07.

**B.    Whether the ALJ Erred in Not Scheduling and Taking Testimony from a Medical Expert**

Plaintiff also argues that "testimony of a Medical Expert is necessary" and contends the ALJ's failure to schedule a medical expert is reversible error. (Dkt. 13 at 11.) He requests "that this case be remanded, with instruction that a Medical Expert be scheduled to testify and offer an opinion as to whether Listing 2.07 is met or equaled." (*Id.* at 12; *see also id.* at 5 ("Based on documented medical evidence, [Plaintiff] argues he meets or equals § 2.07 of the Listings … .").) Defendant responds that "[t]he Court should dismiss Plaintiff's investigative duty claim because the ALJ had sufficient evidence to determine both that Plaintiff did not meet listing 2.07 and was not disabled because he had the ability to do several jobs." (Dkt. 15 at 14.)

Here, the ALJ's conclusion as to whether Plaintiff's Meniere's disease was medically equal to listing 2.07 was a single sentence: "Findings envisioned as equivalent to those required by the listing are not present to medi[c]ally equal the listing." (R. 15.) Plaintiff relies on Social Security Ruling ("SSR") 17-2p to support his argument that the ALJ should have scheduled and taken testimony from a medical expert. (Dkt. 13 at 11.)

SSR 17-2p states, "To assist in evaluating [whether an individual's impairment(s) meets or medically equals a listing], adjudicators at the hearings level may ask for and consider evidence from medical experts (ME) about the individual's impairment(s), such as the nature and severity of the impairment(s)." SSR 17-2p (Mar. 27, 2017), 2017 WL 3928306, at *3. However, SSR 17-2p addresses medical expert evidence further:

> If an adjudicator at the hearings or AC level believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, we do not require the adjudicator to obtain ME evidence or medical support staff input prior to making a step 3 finding that the individual's impairment(s) does not medically equal a listed impairment.

*Id.* at *4.

SSR 17-2p also sets the following articulation standard:

> If an [ALJ] . . . believes that the evidence already received in the record does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, the [the ALJ] is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment. **Generally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding. An [ALJ's] articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3**.

*Id.* (emphasis added).

One court has interpreted the requirements of SSR 17-p2 as imposing a requirement that an ALJ "articulate 'the reason(s) why the individual is or is not disabled' in a way that permits a court to understand and review the ALJ's step-three conclusions for substantial evidence." *Hall v. Saul*, No. 18-CV-2032-LTS-KEM, 2019 WL 5085427, at \*8 (N.D. Iowa Oct. 10, 2019).

Here, the Court considers whether the ALJ articulated reasons "at a later step in the sequential evaluation process" that "provide rationale that is sufficient" for the Court to ascertain the basis for the finding about medical equivalence at step three. *See* SSR 17-2p, 2017 WL 3928306, at \*4. In connection with determining the RFC, the ALJ generally concluded that:

> After careful consideration of the evidence, the undersigned finds the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of those statements are not entirely consistent with the medical evidence and other evidence of record for the reasons explained in this decision.

(R. 17.)

The ALJ then gave several reasons why Plaintiff's "course of care and treatment for dizziness complaints during the relevant time period" were not "at the duration, intensity, and/or frequency alleged during the relevant time period," including "variable reports from the claimant regarding the frequency of his [vestibular] symptoms, and significant gaps in care" and Plaintiff's work as a Lyft and Uber driver as well as an apartment manager who changed lightbulbs and used ladders at times—which were

"highly inconsistent with his alleged restrictions related to Meniere's disease." (R. 18-20.) The ALJ also noted that on December 21, 2016, Plaintiff had "normal hearing" (R. 18); that on February 6, 2018, Plaintiff's hearing was "within a normal range" and that his audiogram "showed a very slight loss in the right ear, and very close to normal hearing" (R. 19); and that based on the May 6, 2018 notes, "[o]n testing, his hearing remained stable and basically normal" (R. 19). In addition, the ALJ noted that Dr. Paparella "indicated normal . . . ability to communicate." (R. 20.) The Court finds these reasons provide a rationale that is sufficient for the Court to determine the basis for the finding about medical equivalence at step three, namely that Plaintiff's hearing was effectively normal and his vestibular symptoms were not as serious as he alleged. Accordingly, the Court finds that the ALJ did not err by not scheduling a medical expert to testify as to whether Plaintiff's Meniere's disease was medically equal to listing 2.07. *See Hall*, 2019 WL 5085427, at *10 ("I also find that elsewhere in the decision, the ALJ sufficiently discussed the reasons why Hall would not be found to meet Listing 11.02 while articulating his analysis and conclusions regarding Hall's disability. In determining Hall's RFC, the ALJ discussed the number and frequency of Hall's migraines, the history and results of Hall's treatment for migraines, and some of the limitations allegedly caused by migraines. . . . The ALJ also discussed the severity of Hall's migraines and his decision to discount Hall's and her doctor's credibility. All of this is sufficient to explain

why the ALJ could find insufficient evidence that Hall's migraines equal Listing 11.02.")

(citations omitted).  The ALJ had sufficient evidence on which to base her conclusion.[9]

## V.    RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED THAT:**

1.    Plaintiff Joel W.'s Motion for Summary Judgment (Dkt. 12) be **DENIED**;

2.    Defendant Commissioner of Social Security Andrew Saul's Motion for

    Summary Judgment (Dkt. 14) be **GRANTED**; and

3.    This case be **DISMISSED WITH PREJUDICE**.


DATED: January 25, 2021                    *s/Elizabeth Cowan Wright*
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge


## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 28 days after being served a copy" of the Report and Recommendation.  A party may

---

[9]    Plaintiff argues, "To leave sole discretion to an ALJ whether a claimant's medical condition might equal a listing, where, as here, the medical evidence clearly documents abnormal audiometry testing but the ALJ describes hearing as 'within normal range,' is to deny the claimant of a full and fair analysis." (Dkt. 13 at 11-12.)  However, it was Dr. Paparella who described Plaintiff's hearing as "within normal range" (R. 597) on the same day the audiogram measured right ear air conduction thresholds up to 35 dB (R. 607).  As explained in Section IV.A, substantial evidence supports the ALJ's conclusions as to Plaintiff's hearing loss.

respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).